Alexander WILSON, individually and as representative of all minority shareholders of Chenango Industries, Inc., other than defendants on and before October 18, 1979, Plaintiff,

v.

GREAT AMERICAN INDUSTRIES, INC. as a corporate entity and as a sole shareholder of Chenango Industries, Inc., Milton Koffman, Burton I. Koffman, Richard E. Koffman, as directors of Great American Industries, Inc., Chenango Industries, Inc., Joseph M. Stack as the representative of Chenango Industries in the merger between Chenango and Great American Industries, and Gary Crounse, David Keith Dyer and Sharon Lee Dyer, as Co-Executors of the Estate of David L. Dyer, deceased, William Starner, and Anthony Mincolla as directors of Chenango Industries, Inc., Defendants.

No. 80–CV–841.

United States District Court,
N.D. New York.

Sept. 5, 1990.

Coughlin & Gerhart, Binghamton, N.Y., for plaintiff; Peter H. Bouman, of counsel.

Beveridge & Diamond, Washington, D.C., for GAI defendants; John N. Hanson, John S. Guttmann, Daan H. Cannon, of counsel.

Hancock & Estabrook, Syracuse, N.Y., for Chenango defendants; Donald J. Kemple, of counsel.

## MEMORANDUM–DECISION & ORDER

McCURN, Chief Judge.

### Background

The plaintiff, Alexander Wilson, represents a class of former minority shareholders of Chenango Industries, Inc. ("Chenango or Chenango I"), who have brought suit challenging the legality of a joint proxy/prospectus ("proxy") issued by Great American Industries ("GAI") and Chenango as part of Chenango's 1979 merger into GAI. The defendants are GAI, Chenango, and various officers, di-

rectors, and attorneys connected with GAI and Chenango who were involved in issuing the proxy. Appeal was taken by plaintiffs from *Wilson v. Great American Industries*, 661 F.Supp. 1555 (N.D.N.Y.1987) (*"Wilson I"*), in which this court granted judgment in favor of the defendants upon the determination that none of plaintiffs' many claims under federal securities statutes had merit.[1] In *Wilson I*, after reviewing evidence and testimony on the question of damages, this court also held that "the defendants' experts were more credible than those of the plaintiff and conclude[d] that, even if a securities law violation had occurred, the plaintiff and the class members would have suffered no damages because of it." *Id.* at 1578.

The Second Circuit reversed, *Wilson v. Great American Industries, Inc.*, 855 F.2d 987, 991 (2nd Cir.1988), (*"Wilson II"*), holding that the proxy statement issued by the defendants contained five material omissions and mis-representations in violation of Section 14(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78n(a), and Rule 14a–9, 17 C.F.R. § 240.14a–9.[2] The five topics on which the proxy failed to properly inform the minority shareholders were: (1) Judge Duffy's decision adverse to GAI in *United Rubber, Cork, Linoleum and Plastic Workers of America, AFL–CIO v. Great American Industries, Inc.*, 479 F.Supp. 216 (S.D.N.Y.1979); (2) Chenango's substantial expansion plans which were made possible by the Broome County Industrial Development Authority's ("IDA") approval of a $1.8 million loan; (3) the non-disclosure of potential conflicts of interests due to the business relationships between David Dyer, Joseph Stack, Anthony Mincolla and the Koffmans; (4) the true worth of Lancaster Towers, a federally subsidized housing project owned and operated by Chenango; and (5) the true value of the Great American Corrugated Container Corporation ("GACCC") a subsidiary of GAI. The Second Circuit found each named defendant liable under Section 14(a)

of the Act. *Wilson II*, 855 F.2d at 995. The appellate court then remanded the action with instructions that the plaintiff should be given a second opportunity to prove their damages. *Id.* at 997.

The essential terms of the merger agreement have previously been set forth as:

(1) GAI acquired Chenango for the book value of its stock, which totaled approximately $1,200,000; (2) Chenango's shareholders exchanged their Chenango shares, which individually had a book value of $4.00, for newly issued GAI Series B preferred stock with a $10.00 per share par value. Accordingly, the exchange was made at a rate of two and a half Chenango shares for each share of GAI Series B preferred; (3) GAI Series B preferred stock would pay a six percent annual dividend; (4) GAI Series B preferred stock could be converted into GAI common stock at a rate of six Series B preferred shares for five shares of GAI common stock; (5) GAI had the right to redeem Series B preferred stock for $10.00 per share after five years; and (6) Chenango shareholders who owned fewer than 110 shares could receive $5.00 per share instead of exchanging their stock for GAI Series B preferred.

*Wilson I*, 661 F.Supp. at 1561; *see also Wilson II*, 855 F.2d at 990. The conditions and timing of the shareholders' approval of the merger was also set out previously.

A meeting of Chenango's shareholders was held on October 18, 1979 in order for the shareholders to vote on the merger. The plaintiff, along with the majority of the other shareholders, voted in favor of the merger. Five shareholders, who owned 4,500 of Chenango's 300,777 outstanding shares, dissented. The transaction officially closed on October 31, 1979, and Chenango became Chenango II, a wholly-owned subsidiary of GAI. After the merger, an appraisal was done, and cash settlements were reached with

---

1. This court's prior decision in *Wilson I* provides an extensive background on the facts, issues, and parties to this suit. This court will assume that the reader is familiar with that decision.

2. Familiarity with the Second Circuit's decision in *Wilson II* is also assumed.

those shareholders who dissented from the merger.

*Wilson I*, 661 F.Supp. at 1561; *see also Wilson II*, 855 F.2d at 990. None of the individuals who dissented and received cash settlements are members of the plaintiff class.

### Measure of Damages

█ When discussing the appropriate measure of damages to be applied by this court on remand the appellate court stated:

> We hold that the plaintiffs are entitled to recover damages equivalent to the *benefit of the bargain* they would have obtained had full disclosure been made. The determination of damages should include a valuation of Chenango's future earning power viewed prospectively from the date of the merger.

> Despite the somewhat speculative nature of the defendants' profit as viewed from the date of the merger, once it is established that the defendants acquired the company by fraud, "the profit was the proximate consequence of the fraud;" it is thus "more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them." *Janigan v. Taylor*, 344 F.2d 781, 786 (1st Cir.), *cert. denied*, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965). When, *as here, the fraudulent buyer received more than the seller's actual loss, damages are the amount of the defendant's profit.* *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741 (1972); *see also Osofsky v. Zipf*, 645 F.2d 107, 112–13 (2d Cir.1981).

> The defendants' argument that *Janigan* is limited to cases in which the purchaser resold the securities at a profit prior to the litigation is without merit. A court *may* award a plaintiff the unrealized appreciation of securities acquired through fraud. *Gerstle v. Gamble–Skogmo*, 478 F.2d at 1305.

*Wilson II*, 855 F.2d at 996 (emphasis added). Though *Wilson II* does not provide a precise methodology for measuring damages in the present action, it does supply a number of instructions which will guide this court's determination. These instructions are:

(1) that the defendants acted fraudulently;

(2) plaintiffs are entitled to the benefit of the bargain they would have obtained absent the fraud;

(3) that any determination of damages must include a valuation of Chenango's future earning power viewed prospectively from the date of the merger;

(4) damages must be set at the amount of the defendants' improperly obtained profit;

(5) damages may include an award to the plaintiffs of the appreciation in value of securities acquired through the fraud; and

(6) the better course is to give the defrauded plaintiffs the "benefit even of windfalls" than to allow the defendants to profit from the fraud.

*Id.*

Determining precisely which profits were earned by the defendants as a "proximate consequence of the fraud" is a thorny issue. Defendants maintain that the plaintiffs are "entitled to recover the difference in value, if any, between what [they] received for [their shares of Chenango] and the price [they] might have received for those shares at the time of the merger if Joseph Stack's projections of the future earning power of Chenango I had been disclosed." Defendants' Post Trial Brief on Remand, at 5. This measure of damages would apparently focus solely upon the alleged undervaluation of Chenango in the proxy, and set damages at the difference between the actual and the proxy price of Chenango.

The plaintiffs, on the other hand, have set forth three alternate measures of damages in their pre-trial memorandum which they believe are appropriate under *Wilson II.* Plaintiffs claim to have incurred damages both as a result of the undervaluation of their shares of Chenango in the proxy *and* the overvaluation of what they received for their Chenango stock—the GAI Series B preferred. The first proposal

would permit plaintiffs to recover the actual "value of what they sold, their interest in Chenango, [minus] the [actual] value of what they received, the shares of Series B preferred." Plaintiff's Pre–Trial Brief at 4.

Plaintiffs second and third alternatives are more complex; they attempt to account for the appreciation in value of GAI and Chenango following the 1979 merger up until 1985—when the Koffmans took GAI (and its Chenango subsidiary) private. These alternatives are based, in part, upon the language in *Wilson II* which states that "[a] court may award a plaintiff the unrealized appreciation of securities acquired through fraud." 855 F.2d at 996. The second alternative focuses on the post-merger value of Chenango and is aimed at disgorging the profits earned by the defendants upon the "resale" of Chenango in 1985. Under this formula the court would determine Chenango's value, as a subsidiary of GAI, at the time it was taken private. Upon this finding, plaintiffs assert, the court could measure the amount of fraudulently obtained profits as the difference between all that the plaintiffs received for their Chenango stock in 1979 (i.e. the actual value of the GAI Series B preferred stock and the dividends received on that stock) and what the plaintiffs would have received if they had maintained their equity position in Chenango until 1985 and then sold their stock when the company was taken private. Plaintiffs' Pre–Trial Brief at 4.

The third measure of damages is a variation on the second measure of damages. It is premised on the concept that had full disclosure been made, the plaintiffs would have received a more favorable exchange of GAI Series B preferred stock for their shares of Chenango.[3] The 1979 merger, therefore, would have provided plaintiffs with a substantially larger proportion of the ownership of GAI, and consequently, a greater share in the "bargain" contemplated in the merger—participation in the future growth and profits of GAI. The plaintiffs contend that they would have realized the benefit of this increased participation when GAI was taken private in 1985. Plaintiffs' Mem. at 5–6. Damages would be calculated as the difference between the fair value of all that the plaintiff class received for their Chenango Stock in 1979 (again, the actual value of the GAI Series B preferred and the dividends received on that stock) and what the plaintiffs would have received if they had been given fair compensation in 1979, transferred that compensation into GAI stock, maintained their equity position in GAI until 1985, and then sold their stock when the company was taken private. This measure of damages would presumably include a factor which would account for the greater amount of dividends the plaintiffs would have received due to their ownership of a larger number of shares of GAI Series B preferred.

The seminal case in this area is *Janigan v. Taylor*, 344 F.2d 781 (1st Cir.), *cert. denied*, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965), which set out the measure of damages in a situation where, as here, securities had been sold to a fraudulent party.[4] The Supreme Court has cited

---

**3.** As noted, the terms of the merger permitted GAI Series B preferred stock to be converted into GAI common stock at a rate of six Series B preferred shares for five shares of GAI common stock. GAI Common was traded on the American Stock Exchange and was valued at approximately $35 per share at the time GAI was taken private in 1985.

**4.** The key language and analysis of *Janigan* with respect to the appropriate remedy is as follows: With respect to damages we draw a distinction between cases where, by fraud, one is caused to buy something that one would not have bought or would not have bought at that price, and where, by fraud one is induced to convey prop-

erty to the fraudulent party. In the former case the damages are to be reckoned solely by "the difference between the real value of the property at the date of its sale to the plaintiffs and the price paid for it, with interest from that date, and, in addition, such outlays as were legitimately attributable to the defendant's conduct, but not damages covering 'the expected fruits of an unrealized speculation.'" ... On the other hand, *if the property is not bought from, but sold to the fraudulent party, future accretions not foreseeable at the time of the transfer even on the true facts, and hence speculative, are subject to another factor, viz., that they accrued to the fraudulent party.* It may, as in the case at bar,

*Janigan* favorably on at least two occasions for the proposition that "where the defendant received more than the seller's actual loss ... damages are the amount of the defendant's profit." *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741 (1972); *Randall v. Loftsgaarden*, 478 U.S. 647, 663, 106 S.Ct. 3143, 3153, 92 L.Ed.2d 525 (1986). The aim of the *Janigan* measure of damages is to prevent "unjust enrichment of a fraudulent buyer." *Randall*, 478 U.S. at 663, 106 S.Ct. at 3153. Under *Janigan* a court may, given appropriate circumstances, "award a plaintiff the unrealized appreciation of securities obtained through fraud" even in "situations where the purchaser [has not resold the securities] within a short time." *Gerstle v. Gamble–Skogmo, Inc.*, 478 F.2d 1281, 1305 (2nd Cir.1973).

The *Janigan* measure of damages may be juxtaposed against what is commonly referred to as "out-of-pocket" damages, that is, "the difference between the fair value of all that the [plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct." *Randall v. Loftsgaarden*, 478 U.S. at 661–62, 106 S.Ct. at 3152. A further twist in the methodology for assessing damages has been termed the "benefit-of-the-bargain rule." This measure of damages permits a defrauded seller of securities to collect "the difference between what was *represented* as coming to the [sellers] and what they actually received." *Osofsky v. Zipf*, 645 F.2d 107, 114 (2nd Cir.1981). However, in the present case this court has been directed to assess damages as the amount of the defendants' profit. *Wilson II*, 855 F.2d at 996. The Second Circuit's directive permits this court, taking into account the particular circumstances of this case, the narrow discretion to taylor a measure of non-punitive damages which are not too speculative and which does the best job

of compensating an injured plaintiff while disgorging improperly obtained profits. *See also Gerstle v. Gamble–Skogmo, Inc.*, 478 F.2d at 1303–06; *Osofsky v. Zipf*, 645 F.2d at 111–14 (Section 28(a) of the Securities Exchange Act of 1934 "speaks only in general terms, but we do not believe that its overall intent is to restrict the forms of nonspeculative, compensatory damages available to defrauded parties.... [W]e believe that the purpose of section 28(a) is to compensate civil plaintiffs for economic loss suffered as a result of wrongs committed in violation of the 1934 Act, whether the measure of those compensatory damages be out-of-pocket loss, the benefit of the bargain, or some other appropriate standard." *Id.* at 111).

This court holds that the appropriate measure of damages is the first alternative proposed by the plaintiff, that is, the difference in the actual value of all that the plaintiffs should have received for their shares of Chenango and the actual value of what they received in exchange for their Chenango stock (i.e. the GAI Series B preferred stock). Under this formula, the court will have to engage in a prospective valuation of both Chenango and the GAI Series B preferred as of the date of the 1979 merger. However, the court will not engage in an evaluation of the post-merger appreciation in the value of GAI or Chenango, nor will the court award damages based upon this post-merger accretion in value. Rather, an award of interest, if necessary, will compensate the plaintiff fairly and adequately for any loss. This measure of damages will most effectively disgorge the profits earned by the defendants because it is aimed at taking from the defendants and providing to the plaintiffs all that the defendants might have earned on the 1979 merger. It compensates the plaintiff class for any overvaluation of GAI Series B pre-

---

be entirely speculative whether, had plaintiffs not sold, the series of fortunate occurrences would have happened in the same way, and to their same profit. However, there can be no speculation but that the defendant actually made the profit and, *once it is found that he acquired the property by fraud, that the profit*

*was the proximate consequence of the fraud, whether foreseeable or not. It is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them....* [I]t is simple equity that a wrongdoer should disgorge his fraudulent enrichment. 344 F.2d 781, 786 (1965) (emphasis added).

ferred and any undervaluation of Chenango.

The second and third alternate measures of damages proposed by the plaintiffs, both of which would take into account post-merger appreciations in the value of Chenango or GAI over a five year period, would cause this court to award damages which are too speculative in nature. As stated by the Second Circuit, "[t]he passage of time introduces so many elements . . . that extreme prolongation of the period for calculating damages may be grossly unfair." *Gerstle v. Gamble–Skogmo, Inc.,* 478 F.2d at 1306 and n. 27. There is no comprehensive information before the court on what caused the post-merger appreciation in value of GAI. It could have been management, market conditions or a number of other complex factors. This is particularly so with respect to the plaintiffs' second proposed measure of damages which would involve a valuation of Chenango as it existed in 1985—approximately five years after being made a subsidiary of GAI. The second measure of damages proposed by the plaintiffs would essentially be asking this court to "unscramble the eggs." The plaintiffs' third proposed measure of damages has some appeal because it does stick to the bargain contemplated in the merger. However, the court finds it difficult to accept the proposition that a stock price set on an arbitrary merger date in 1985 would fairly represent the damages incurred by the plaintiffs, or the profits earned by the defendants, which were a "proximate consequence" of the 1979 fraud.

Moreover, there is little information before the court on whether the plaintiffs *as a class* retained their shares of GAI Series B preferred, exchanged this stock for GAI common stock, or sold the GAI stock altogether and used the proceeds for some other purpose. To proceed with either the second or third measure of damages proposed by the plaintiff would cause this court to engage in certain assumptions that may well be incorrect. Finally, this merger involved a stock for stock transaction. The court does not know, and cannot really know, whether a non-fraudulent transaction which supplied the plaintiffs with an appropriate amount of GAI Series B preferred would have resulted in a dilution of the value of each individual share of GAI common. If a non-fraudulent merger would have resulted in a good deal more shares of GAI common being traded on the American Stock Exchange then, logically, the price per share would be lower than the $35 per share price set in 1985.

Defendants, in support of their proposed measure of damages, assert that the plaintiffs have not alleged a misrepresentation in the proxy statement as to the value of the Series B preferred stock. They contend that it would be unfair now to assess damages with respect to any overvaluation of the Series B preferred. However, the plaintiff class has alleged, and the Appellate Court has found, that mis-representations were made as to certain items which would impact on the value of GAI and presumably the GAI Series B preferred—specifically, information concerning the *United Rubber* decision and the value of the Great American Corrugated Container Corporation. To the extent that the value of Series B preferred stock was linked to the value of GAI, the Series B preferred may well have been overvalued. Thus, it is appropriate to consider whether GAI was overvalued in the proxy, as well as whether Chenango was undervalued, when calculating damages. Moreover, the court's review of the actual value of Chenango in 1979 will not be limited to the prospective value if Joseph Stack's projections had been disclosed. The Appellate Court found that the misrepresentations and omissions in the proxy statement would have colored the consideration that the plaintiff class would have given to the proxy as a whole. Therefore, a more searching analysis of the prospective value of Chenango and GAI Series B preferred stock, as of the 1979 merger date, is appropriate.

### Calculation of Damages

The measure of damages which will be applied is the difference in the actual value of plaintiffs' shares of Chenango and the actual value of what they received in

exchange for their Chenango stock, that is, the GAI Series B preferred stock. The valuations will be made viewing the merger transaction prospectively from the date the merger was completed—October 18, 1979.

As of the date of the merger, Chenango was a moderately sized corporation which provided custom manufacturing services, as a subcontractor, to electronics equipment manufacturers. Chenango was a "job shop" which employed approximately 600 workers mostly in the manufacture of commercial printed circuit boards and military multi-layer boards, and the assembly of small electromechanical products. The company did not engage in research and development. Chenango also owned as a subsidiary a federally subsidized moderate and low income housing project for the elderly known as Lancaster Towers. The company's central offices were located in Broome County, New York. The chairman, president, and treasurer of Chenango was Joseph M. Stack, who, together with the Koffmans, controlled approximately 71% of the company. The 300,777 outstanding shares of Chenango were traded "over the counter" by a small number of brokers in the Broome County area. From the limited information available, it appears that the price of a share of Chenango ranged from a high of 5½ to a low of 3¼ over the two-year period before the merger. Most sales of the stock were to Mr. Stack, and then, mostly as an accommodation to the shareholder.

Chenango's main customers were sizable manufactures in the computer, communications, industrial controls, and medical instrumentation industries. IBM was Chenango's largest customer—accounting for approximately 50% of Chenango's business. At the time of the merger Chenango occupied almost 100,000 square feet of office, manufacturing, and warehouse space; one-third of this space was owned by the company while two-thirds was leased.

Prior to the date of the merger, Chenango had embarked on a substantial expansion plan to construct an additional plant, renovate existing facilities and purchase new equipment. The expansion of the capacity to manufacture multi-layer circuit board was to be financed by the issuance of $1.8 million in industrial development bonds by the Broome County IDA. As stated by the Appellate Court in *Wilson II*, while these expansion plans were not formally completed before the merger, there was a strong probability that the financing and subsequent expansion would come to fruition. 855 F.2d at 992–93. The expansion envisioned also included the addition of nearly 100 employees.

Testimony of five expert witnesses concerning damages was placed before the court at the original trial and the trial on remand. Three experts testified on behalf of the plaintiff and two testified on behalf of the defendants. As will be discussed, this court finds the testimony of plaintiffs' expert Thomas Higgins to generally be the most thorough and credible. However, the court wants to make clear its impression, after the trial on remand, that *all* of the experts appeared to have engaged in a rather exceptional amount of numbers juggling to reach a desired result. One of the methods employed by Higgins to estimate the actual value of Chenango in 1979 (a well accepted formulation known as the "Gordon Model"), when *properly* applied, appears to be the least likely to be subject to result orientated manipulation. This court finds, however, that the defendants have pointed out a number of deficiencies in the actual application of Mr. Higgins's methodology which will reduce, somewhat, his estimation of the actual value of Chenango as of the date of the merger. The court also accepts Mr. Higgins' straightforward position that the actual value of GAI Series B preferred was its value relative to GAI common's market value on the date of the merger. Moreover, the court accepts plaintiffs' general position that the fair market value of Lancaster Towers was the $1.1 million value attested to by Joseph Stack in his loan application to the Broome County IDA in April of 1979. The testimony and submissions of the experts and the court's findings with respect to their credibility will be discussed in turn.

## Norman Turner

Norman Turner testified both at the original trial and at the trial on remand on behalf of the plaintiffs. Now, as before, the court finds the testimony of Mr. Turner to be of limited assistance in determining the actual value of Chenango as of the date of the merger in October of 1979.[5] The central means employed by Mr. Turner to determine the value of Chenango was his practical experience as the former president of Magnetic Laboratories, Inc., ("Magnetic") and his experience as a person who has bought and sold a number of companies in the past. It is Mr. Turner's opinion that Chenango and Magnetic were very similar companies that were both merged into larger corporations at approximately the same time. Turner asserts that the owners of Magnetic received a far more favorable rate of compensation upon its merger into Savin, Inc., than the owners of Chenango received upon its merger into GAI. Based upon a rather anecdotal comparison between the two corporations, Mr. Turner estimated that the true value of Chenango at the time of the merger was somewhere between $5 and $10 million and that he would have expected to receive approximately $8 million for Chenango in 1979. Mr. Turner's testimony and the basis for his expert opinion was essentially the same at both the original trial and the trial on remand.

As the defendants effectively brought out through the cross-examination of Mr. Turner and by the direct testimony of Mr. Stack at the original trial, Magnetic was a far larger, more highly capitalized, and diverse corporation than Chenango. While Chenango was a somewhat limited "job shop," Magnetic was a full scale manufacturing facility with the capacity to design and produce a large variety of computer components and electronic products. Though an appropriate comparison be-

tween these two corporations might be of some potential value, this court is also convinced that Mr. Turner was not sufficiently familiar with Chenango to provide a credible analysis to the court. Mr. Turner had only been to the Chenango facility on two occasions—giving him relatively little information upon which to base his estimates. Moreover, the court finds that the sale of Magnetic to Savin was accomplished under much more favorable circumstances than the sale of Chenango to GAI. In the former merger, Savin executives were being pressed hard to obtain a domestic manufacturing facility such as Magnetic, while in the latter merger it was Chenango who first approached GAI to propose a merger. In sum, the court does not find Chenango and Magnetic sufficiently similar, nor the circumstances of their merger into larger corporations sufficiently alike, to make the ad hoc valuation methodology employed by Mr. Turner a credible source of information.

## Ronald Quintero

The plaintiffs' second expert witness at the trial on remand was Ronald Quintero, who is the founder and managing director of Chartered Capital Advisors, Inc., an organization which provides valuation services to a number of corporate and individual clients. Mr. Quintero testified at the original trial for the plaintiffs while he was employed as an associate of the Wall Street investment firm Bear, Stearns & Co., Inc. At both the original trial and the trial on remand Quintero testified in detail concerning his use of the "discounted cash flow" methodology to value a corporation. At both proceedings Mr. Quintero submitted a written report in addition to his testimony. At the original trial this court found that Mr. Quintero's analysis was subject to substantial flaws—finding many of defendants' criticisms to be well taken. The

---

5. In *Wilson I*, 661 F.Supp. at 1577 this court, after evaluating the testimony of Mr. Turner, stated:

> This court gives little if any credence to the testimony of Turner for the reason that Magnetic was a much different company than Chenango. Joseph Stack testified at length about the many areas with which Magnetic

was involved. Chenango has only been involved with a small fraction of those areas by comparison. The court is not satisfied that Turner is well familiar with Chenango and concludes that his own experiences with Magnetic are irrelevant to the question of placing a value on Chenango.

court found that the discounted cash flow analysis was potentially subject to a good deal of manipulation based on relatively slight adjustments in certain variables. For that and other reasons, including the courtroom demeanor and clarity of Mr. Quintero, this court originally determined that his analysis should be given little weight. *See generally, Wilson I,* 661 F.Supp. at 1577–78.

In a second report which has been submitted to the court, Quintero has concluded that the fair market value of Chenango and its subsidiary, Lancaster Towers, was between $6,033,000 and $6,286,000 as of June 28, 1979. Quintero's focus in the revised report was again the discounted cash flow analysis. This time he performed four discounted cash flow calculations under alternate scenarios along with what Quintero termed an adjusted net worth valuation of Chenango. The results of the five alternate valuations were then averaged to determine his estimation of the value of Chenango. To this figure Mr. Quintero added the value of a subsidiary of Chenango, Lancaster Towers. Mr. Quintero determined that the true 1979 value of Lancaster Towers was revealed by the estimate provided by Joseph Stack in his application to the Broome County IDA, that is, $1.1 million. Next, Quintero performed a complex valuation of the GAI Series B Preferred stock, estimating that the value of an individual share ranged between $7.25 and $7.50 (as opposed to the $10.00 par value), and that the fair market value of all the GAI Series B Preferred ranged from $872,253 to $902,331 (as opposed to the proxy value of $1,200,000).

As discussed in *Wilson I,* 661 F.Supp. at 1577–78, and again on the trial on remand, this court finds many of the criticisms of Mr. Quinter's use of the discounted cash flow analysis to be well taken. After the first trial this court relied on the testimony of Gilbert Matthews, a managing director of Bear, Stearns & Co., and Bernard Dorshow, a principle in the investment banking firm of Woolcott & Co., to find that the discounted cash flow analysis was susceptible to manipulation. At least two courts have also been fairly critical of the discounted cash flow methodology. *See e.g., Methlyn Realty Corp. v. Esmark, Inc.,* 763 F.2d 826, 835 (7th Cir.1985); *Public Service Comm'n of New York v. F.E.R.C.,* 813 F.2d 448, 663–65 (D.C.Cir.1987). However, the most convincing critique of Mr. Quintero's methodology was expressed by the plaintiffs' other expert, Thomas Higgins, president of Higgins, Marcus & Lovett, Inc., a Los Angeles business valuation and financial analysis firm. Mr. Higgins' working papers revealed that he had performed a number of valuations of Chenango employing the discounted cash flow methodology. He found that results varied greatly depending upon the assumptions which were employed. After reviewing the results, Mr. Higgins concluded that the discounted cash flow analysis was not an appropriate methodology for use in valuing Chenango. It should also be noted that Mr. Higgins' work papers contained a copy of Mr. Quintero's original report upon which Higgins had noted a number of errors and criticisms.

Moreover, the court found the evidence presented by Mr. Quintero to be somewhat confusing and vague. The courtroom testimony and report, both as to the value of Chenango and the value of GAI Series B Preferred, is replete with assumptions and adjustments which the court found to be ill defined and explained. However, Mr. Quintero's position, that the value of Lancaster Towers was the value as estimated by Joseph Stack, was generally convincing. In sum, this court concludes that the discounted cash flow analysis as it was performed and explained by Mr. Quintero was not convincing in light of the more thorough and precise testimony which was provided by other expert witnesses.

### Bernard Dorshow

Bernard Dorshow, an experienced investment analyst, was the defendants' key witness on the issue of damages at the original trial. After weighing the testimony of Mr. Dorshow against that of the plaintiffs' witnesses in the original trial, the court found Dorshow to be more credible. *See Wilson I,* 661 F.Supp. at 1577–78. Dorshow did not testify at the trial on remand.

Though the court found him to be credible at the original trial, in light of the additional testimony, analysis, and the Appellate Court's decision, the court now finds that his testimony should be given little weight.

In his estimate of the value of Chenango at the original trial, Dorshow employed three methodologies; they were: (1) the adjusted book value method, (2) the stock market price of Chenango, and (3) the capitalization of earnings method. Dorshow concluded that the accurate value of Chenango common stock at the time of the merger was the proxy price of $4.00 per share and that the GAI Series B Preferred stock was actually worth more than its $10.00 par value proxy price.

As an initial matter, the court finds that the methodology employed by Mr. Dorshow focused on the past record of Chenango rather than on valuing the future earning power of the corporation. Dorshow made little use of the projections of future growth and profits which were made by Joseph Stack before the Broome County IDA and he did not accept the Stack valuation of Lancaster Towers. Thus, the data relied upon by Mr. Dorshow does not comport with the general directive of the Appellate Court in *Wilson II.*

Dorshow's use of the adjusted book value method is a good example of how his analysis does not measure the value of Chenango in accordance with the Second Circuit's directive. By focusing on the book value of Chenango Dorshow essentially made a valuation of Chenango's assets as of 1979. Viewed in this light, Chenango is seen as a company which owned a modest amount of equipment and manufacturing space, and which rented a full two thirds of the offices, warehouses, and working area which it employed. This method does not take into account such important factors as Chenango's trained 600 employee work-force, its ongoing business relationship with IBM, the experience of its management, corporate good will, or future expansion plans made possible by a $1.8 million IDA loan.

■ The same is true of Dorshow's use of the stock market price of Chenango to value the Chenango common stock. As discussed above, the 300,777 shares of Chenango were not traded on any stock exchange. Rather, the stock was traded "over the counter" by a very small number of brokers in the Broome County area. The stock was traded in a very infrequent manner. Almost all sales of the stock were made to Joseph Stack who usually purchased the Chenango common as an accommodation to the seller. The limited information available informs the court that the price per share of Chenango fluctuated between $5½ and $3¼ over the two year period prior to the merger. This thin trading level does not constitute a "market value" upon which this court may reasonably rely. There was no market. Any price of Chenango was essentially set by Mr. Stack, a participant (as determined by the appellate court) in the fraudulent sale of Chenango, and does not appear to have any relation to the future earnings power of the company viewed prospectively from the date of the merger. Therefore, the court finds the estimated value of Chenango using the "market" price to be of no assistance.

Finally, Dorshow employed a capitalization of earnings method. While this method better agrees with the Appellate Court's directive, the court now finds that the capitalization of earnings methodology employed by plaintiffs' expert, Thomas Higgins, to be a more thorough and well reasoned analysis.

*Gilbert Matthews*

The defendants' primary witness concerning damages at the trial on remand was Gilbert Matthews, a Managing Director of the Wall Street investment firm Bear, Stearns & Co., Inc. Along with his testimony Matthews provided a report detailing his analysis. Mr. Matthews had testified at the original trial but mostly in rebuttal to the testimony of Ronald Quintero. Three methodologies were employed by Matthews to determine the cash value of Chenango; these were: (1) a valuation of Chenango's assets, (2) the market value of Chenango stock, and (3) an estimate of Chenango's going concern value. Accord-

ing to Mr. Matthews the fair cash value of Chenango in 1979 ranged between $1.5 to $1.8 million inclusive of Lancaster Towers. Moreover, Matthews conducted a valuation of the GAI Series B preferred which was exchanged for the Chenango common and determined that its value ranged between $959,000 and $1.1 million.

Many of the same criticisms which the court found to be applicable to Mr. Dorshow's asset valuation of Chenango apply to Matthews' asset valuation of Chenango. As discussed, the court is convinced that a valuation of the assets of Chenango does not accurately reflect the worth of the company viewed prospectively from 1979; Chenango's value as a going concern with 600 employees, a strong customer base, and plans for a major expansion are simply not taken into account. The same comparison to Dorshow is relevant to Matthews' use of the supposed "market value" of Chenango common stock. The court has found that there simply was no market for Chenango and, consequently, there can be no realistic market value.

The third methodology employed by Mr. Matthews was aimed at determining the "going concern" value of Chenango. This valuation model appears to the court to be relatively useful because it attempts to value Chenango's future earning power from the date of the merger. The methodology employed by Matthews gleaned data from a number of other "similar" corporations, reviewed a number of financial ratios from Chenango's past performance, and on this basis estimated a value of Chenango absent of Lancaster Towers. While this would appear to give some indication of value, the court, after reviewing the wildly divergent views of the experts, is unwilling to rest its judgment on a methodology which is based upon comparisons of Chenango to other "similar" corporations. Moreover, this mode of analysis does not value Chenango in a manner which is sufficiently fact specific to its particular circumstances and *its* projected growth. Finally, the court finds that the general methods used by the plaintiffs' expert, Thomas Higgins, to more accurately reflect the actual value of Chenango.

### Thomas Higgins

Mr. Higgins is the president of Higgins, Marcus & Lovett, Inc., a business valuation firm located in Los Angeles, California. Though he did not testify at the original trial, Higgins provided testimony and submitted an extensive report on behalf of the plaintiffs at the trial on remand.

Three valuation methods were employed by Higgins to estimate the fair market value of Chenango as of October 18, 1979 (the "valuation date"), the date the Chenango shareholders met and voted to approve the merger with GAI. These methodologies were: (1) the capitalization of earning power method, (2) the sale of comparable company method, and (3) the publicly-traded comparable companies method.[6] The

---

**6.** The Capitalization of Earning Power formula as applied to Chenango was defined as a method which:

> Reflects the Company's expected earnings base at the Valuation Date which grows at a rate of 18% for the first five years, and at a long term rate of 7% for all subsequent years, discounted by the expected rate of return on equity that is adjusted for growth of a perpetual stream of annual earnings which will grow by an estimated percentage each year.

The Sale of Comparable Company method is defined as one which:

> Examines the sale price and value of a company comparable to [Chenango] and examines the price to earnings (P/E), price to book value (P/BV), and price to sales (P/S) of the comparable company, adjusts these ratios for application to the Company, and then calculates these adjusted ratios for the Company to determine a value for the Company.

The Publicly-traded Comparable Companies method:

> Examines the size, capitalization, and other characteristics of publicly-traded companies that may be similar to [Chenango]. After eliminating those companies that are determined to be different from the Company, the price to equity (P/E), price to book value (P/BV), and price to sales (P/S) of the publicly-traded comparable companies are applied to the Company to determine a value for the Company if it [was] publicly-traded on a minority basis. A control or takeover premium is then calculated to determine the fair market value of the common stock of the Company if sold as an entirety as of the Valuation date.

Plaintiffs' Exhibit 1, Trial on Remand, at 48–49.

values of Chenango's common stock which were obtained were then weighted and averaged to obtain an estimate of the fair market value. In the cover letter to the report, Higgins defined the term "fair market value" as representing "the amount at which a business interest would change hands between a willing seller and a willing buyer when neither is acting under compulsion and when both have reasonable knowledge of the relevant facts." (Plaintiffs' Exhibit 1, Trial on Remand, at i). Higgins estimated the fair market value of Chenango to be $5,985,000, which calculates out to a $19.90 per share price. As is apparent from the testimony and the report, Mr. Higgins limited the information he relied upon to that which was available to the plaintiff class as of the valuation date. In this manner, the methodology employed by Mr. Higgins most closely followed the Second Circuit's directive in *Wilson II* to include "a valuation of Chenango's future earning power, viewed prospectively from the date of the merger" in any calculation of damages. 855 F.2d at 996.

Higgins first reviewed the general economic outlook as of the valuation date. According to the report there was every indication in 1979 that the country was heading into a recession. The economy was sluggish and the rate of growth in the GNP had fallen sharply to 1.1%. There were economic shocks caused by the oil embargo, rising interest rates and high inflation. Consumer spending was weak. Most economists were forecasting a recession and trends in the index of leading economic indicators predicted a worsening economy. However, corporate profits were stable and the stock market was still considered solid. With respect to the electronics industry (i.e. the manufacturers of semiconductors, capacitors, transistors, printed circuit boards, etc.) the general outlook was moderate to good, with a heavy backlog of orders for electronic components due to the introduction of new products.

The economic forecast for IBM, Chenango's largest customer, was also analyzed prospectively from the valuation date. It is Mr. Higgins' well-taken opinion that the economic outlook for IBM, which provided Chenango with approximately 50% of its business, would have a significant effect on Chenango's future performance and consequently, its value. The general opinion at the time was that IBM, though still strong, was in a period of decline. Profits were lower and revenues were weak for the second and third quarters of 1979. Estimated earnings had been reduced by most analysts for the remainder of 1979 and for 1980. An important factor in the declining profits, however, was that IBM was investing heavily in increased plant capacity, cutting prices, and introducing new product lines—steps which were viewed as having positive long-term implications. IBM still retained a 40 to 60% share of the computer systems market, had a heavy backlog of orders, and was beginning to bring on line the IBM P.C. project—which was also viewed as positive news for IBM.

Higgins next performed a detailed analysis of Chenango's finances relying upon the financial statements of the company for the fiscal years ending September 30, 1974 to 1978, and interim financial information up to June 30, 1979. After a review of the sales, gross profits, operating expenses, net profits, debt, and various economic ratios used in evaluating a company's financial status, Higgins concluded that Chenango compared favorably to other corporations in the electronic components industry as of the valuation date. The net income after taxes for the twelve month period ending on June 30, 1979, was $291,000.[7] As of June 30, 1979, Chenango's total assets were $2.71 million, total liabilities were $1.46 million, total long term debt was $491,000, and the net worth of Chenango (the shareholder's equity) was $1.25 million.

7. It should be noted that Chenango's net income in *1974* was approximately $289,000. Net Profits fell sharply and then recovered over the next few years. However, given the rate of inflation at the time it would appear that net income, in real terms, may well have been down.

■ Higgins, appraisal of the fair market value of Chenango was premised on an initial determination concerning the sustainable net income of Chenango viewed prospectively from 1979. Higgins relied upon Joseph Stack's net income projections for fiscal years 1979–83 which were made in April of 1979 to the Broome County IDA. To corroborate the Stack projections Higgins then performed a "regression analysis" of Chenango's earnings from 1974 to June of 1979. What this regression analysis entailed is still somewhat of a mystery to the court. As one might expect, Higgins testified that Stack's optimistic projections concerning Chenango's future net income was valid. In any event, this court has now accepted plaintiffs' general position that the Stack projections are valid and represent an appropriate projection of Chenango's future earnings potential. Though Mr. Stack may have been engaging in a certain amount of puffery in his projections, once having attested to their validity before the Broome County IDA and then having been found by the appellate court to have engaged in securities fraud, both he and the other defendants must abide by them.

The first method employed by Mr. Higgins, known as the Capitalization of Earnings Power method, appears to be the most credible. The reason the court finds this method to be the most appropriate is not due to Higgins' application of same. There were serious errors made by Higgins. Rather, this method, which employs the well known "Gordon Model," appears, when properly applied, to be the least subject to result orientated manipulation while at the same time most closely following the Appellate Court's mandate.[8] This model essentially defines the value of a corporation as the combined value of all future earnings. By a fairly crude analogy, this method may also be seen as a complex version of the basic financial formula that defines income (I) as the product of principal (P) multiplied by the rate of return (R), or:

$$I = P \times R$$

which can be reformulated if the unknown variable is the principal to read:

$$P = I/R$$

In the present case, the value of all future earnings will have to be discounted back so that the value is expressed in 1979 dollars.

Many of Mr. Higgins' initial premises are acceptable to the court. Higgins employed the 18% annual growth rate in net income projected by Joseph Stack—estimating that the growth would continue at 18% for five years and then level out at 7% due to normal growth cycles. The projected net income of Chenango for 1979 was $345,000. Higgins estimated the rate of return that an investor would expect from a business similar to Chenango—finding the necessary rate of return to be 21.4%.[9] To calculate the value of Chenango Higgins used a complex version of the "Gordon Model." The most basic formulation of the Gordon Model is:

---

8. Use of the Gordon Model to determine the value of a closely held corporation is discussed in E. Brigham & L. Gapenski, *Financial Management: Theory and Practice* (5th Ed.) at 147–152 and S. Pratt, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* (2nd Ed.) at 98.

9. To calculate the expected rate of return Higgins employed the Capital Asset Pricing Model or CAPM. This formula may be summarized as: Expected Rate of Return = RF + B(Rm – R1)

RF = Risk-free Rate of Return (set at 10% rate of return on long term government bonds).
B = Company's Volatility (estimated from the average B factor of corporations engaged in

the "electric components" industry set at 1.52).

Rm = Long Term Expected Rate of Return for Market as a Whole (set at 11%).

R1 = Long Term Risk-free Rate of Return on Market as a Whole (set at 3.5%).

This calculation works out as:

21.4% = 10.0% + (1.52 × (11.0% − 3.5%))

The court finds Higgins' use of this method to calculate the expected rate of return to be credible.

$$PV = \frac{E \cdot (1 + g)}{R - g}$$

where: 
PV = Present Value
E = Base level of earnings from which the constant level of growth is expected to proceed as of the valuation date.
g = Annually compounded rate of growth in earnings.
R = Discount rate (investor's required rate of return).

The Gordon Model as employed by Higgins reads:

$$\text{Value of Equity} = \frac{E(1 + G_{1-5})^5(1 + G_{6+})}{(R - G_{6+})}$$

where:

$E$ = Estimated base earning power of Chenango = \$345,000
$G_{6+}$ = Long term annual growth rate in earnings = 7%
$G_{1-5}$ = Growth rate in earnings years 1–5 = 18%
$R$ = Expected rate of return on equity = 21.4%

Thus,

$$\text{Value of Equity} = \frac{\$345,000 \ (1.18)^5(1.07)}{(.214 - .07)} = \$5,865,000$$

---

However, as was correctly identified by the defendants on cross examination, Higgins' application of this formula actually is an estimate of Chenango's future earning power as of 1984, 5 years after the merger, rather than an estimate of the future earnings power as of 1979. *See* Defendants' Post Trial Brief on Remand, at 13–16. Essentially what Higgins did was to come up with an estimate of Chenango's base earning power as of 1984 (which is accounted for by $E(1 + G_{1-5})^5$ or \$345,000(1.18)$^5$) and plugged that 1984 value into the normal Gordon Model. If this amount is discounted back to 1979 at a rate of 21.4% per year (i.e. multiply \$5,865,000 by $\frac{1}{1.214}$ each year for five years) one obtains a 1979 value of \$2,223,953.

However, the court must also account for the value of Chenango's earnings from 1979–1984. The appropriate application of the Gordon Model, given Higgins' estimates, would entail two calculations: one which accounts for the 1979 value of Chenango's earnings for the time period of 1979–1984 where it was estimated that Chenango would grow at a annual rate of 18%, and one which accounts for the 1979 value of Chenango's post 1984 earnings where it was estimated that Chenango would grow at a rate of 7% annually. The sum of these two values reflects the entire 1979 value of Chenango's future earnings. As discussed above, Mr. Higgins has performed the second calculation for the post 1984 period.

The calculation for the 1979–1984 time period requires the court to take the 1979 estimated earnings of the company and multiply that sum by the projected 18% annual rate of growth to receive the estimated earnings for Chenango in 1980–84. Next, in order to determine the 1979 value of the 1980–84 earnings, the 1980–84 figures must be discounted to 1979 dollars. Higgins estimated that an investor in Chenango would require a 21.4% annual rate of return. The value of earnings will therefore be discounted at this rate. This calculates out as follows:

| Base Year Earnings | × | 18% Annual Growth | = | Non-discounted value | × | Discount Rate 21.4% | = | 1979 Value Earnings |
|---|---|---|---|---|---|---|---|---|
| (1980) $345,000 | × | 1.18 | = | $407,100 | × | .82 | = | $ 333,822 |
| (1981) $345,000 | × | 1.39 | = | $479,550 | × | .68 | = | $ 326,094 |
| (1982) $345,000 | × | 1.64 | = | $565,800 | × | .56 | = | $ 316,848 |
| (1983) $345,000 | × | 1.94 | = | $669,300 | × | .46 | = | $ 307,878 |
| (1984) $345,000 | × | 2.29 | = | $790,050 | × | .38 | = | $ 300,219 |
| | | | | | | | | $1,584,861 |

Therefore, the 1979 value of Chenango's earnings for the five years of 18% growth is $1,584,861. Adding this value to that received for the post–1984 period gives the 1979 value of Chenango's future earnings, or

1979 Value = $1,584,681 + $2,223,953 = $3,809,000 (rounded)

To this value must be added the Joseph Stack's estimate of the value of Lancaster Towers, that is $1.1 million.

| | |
|---|---|
| Capitalization of Earning Power | $3,809,000 |
| Add: Value of Lancaster Towers | $1,100,000 |
| Fair Market Value of Common Stock of Chenango if Sold as Entirety. | $4,909,000 |

Higgins also employed the sale of a comparable company method which essentially compares the merger of Magnetic Laboratories with the merger of Chenango. This is a method which is nearly identical to that which was employed by one of plaintiffs' other experts, Norman Turner. For much the same reasons as discussed above, the court finds this method to lack credibility. The two corporations were different and were sold under different circumstances. Magnetic Laboratories engaged in manufacturing which was far broader and more sophisticated in scope than Chenango, Magnetic marketed is own products to wholesalers and even retailers while Chenango did not, Magnetic performed research and development services while Chenango did not, and Magnetic had a much more diverse client base.

The court also finds that the publicly traded comparable companies method employed by Higgins to be of little assistance in determining the true value of Chenango. This method attempts to locate other companies which were similar to Chenango in 1979 and whose stocks were traded on a viable market. A comparison of numerous financial ratios between these publicly traded companies and Chenango is used to estimate Chenango's market value. In Mr. Higgins' analysis, however, he employed a company which appears to be a clear ringer intended to skew upward the estimated value of Chenango. Robinson Nugent, Inc., compared far more favorably to the other companies selected by Higgins and, as was brought out by the defendants, was a far more developed and diverse company than Chenango. Moreover, in performing this analysis, Higgins applied an acquisition premium to further boost the price of Chenango. This premium would appear to be inappropriate because the defendants had effective control of Chenango *prior* to the time of the merger. Therefore, this court will give little weight to Mr. Higgins' third method of calculating the fair market value of Chenango.

*Value of GAI Series B Preferred*

The shareholders of Chenango received shares of GAI Series B preferred stock in exchange for their Chenango stock. The measure of damages which the court is applying requires a valuation of the actual value of the GAI Series B preferred as of the date of the merger. The merger set the GAI Series B at a par value of $10.00. Chenango common was exchanged for .4 share of GAI Series B preferred. Moreover, GAI Series B preferred could be exchanged at any time for GAI Common Stock at a rate of 6 shares of GAI Series B preferred to 5 Shares of GAI Common. GAI common was traded on the American Stock Exchange. Thus, an owner of GAI Series B preferred could, after the merger, convert his stock to GAI Common and sell the stock at the market rate.

Of all the experts who testified concerning the value of the GAI Series B preferred stock, the only appropriate analysis was the straight forward position presented by Mr. Higgins. Higgins argued that the value of the GAI Series B was its conversion value relative to the GAI common on the date of the merger. Despite all of the adjustments, premiums and dividend ratios presented by the other witnesses, the court finds that a market existed for the Series B preferred through its conversion value into GAI Common, and that this market reflects its actual price.

As discussed on page 119 of Higgins' report, 120,310 shares of GAI Series B preferred were issued in exchange for the 300,777 shares of Chenango Common. Since six shares of GAI Series B preferred could be exchanged for five shares of GAI Common, the exchange of Chenango Common could be converted into 100,254 shares of GAI Common. The American Stock Exchange price of GAI Common on October 31, 1979, (the date the merger was finalized) was $7.75 per share. Thus,

100,254 (shares of GAI Common Stock issuable on Conversion)

× $7.75 (market value of GAI Common on 10/31/79)

= $776,969 The total fair market value of all that the Chenango shareholders received in exchange for their stock.

*Damages*

■ This court has previously held that the appropriate measure of damages is the difference in the actual value of all that the plaintiffs should have received for their shares of Chenango and the actual value of what they received in exchange for their Chenango Stock, that is, the actual value of the GAI Series B preferred stock. Given the values as calculated above, and noting that the plaintiff class represented 18.77% of the shareholders of Chenango, the damages are:

| | |
|---|---|
| Fair Market Value of Chenango 10/18/79 | $4,909,000 |
| Less: 10/31/79 immediate conversion value of GAI Series B preferred | −$ 777,000 (rounded). |
| = | $4,132,000 |
| Multiplied By Percentage of Minority Shareholders in Plaintiff Class | × 18.77% |
| Damages Due the Plaintiff Class = | $ 776,000 (rounded). |

Therefore, this court holds that the plaintiff class received $776,000 less than it should have received as a result of the merger.[10]

*Pre-judgment Interest*

■ Both parties agree that the award of pre-judgment interest is within the sound discretion of the trial court. *Norte & Co. v. Huffines,* 416 F.2d 1189, 1191 (2nd Cir.1969); *cert. denied, sub nom., Muscat v. Norte & Co.,* 397 U.S. 989, 90 S.Ct. 1121, 25 L.Ed.2d 396 (1970); *Chris–Craft Industries, Inc. v. Piper Aircraft Corp.,* 516 F.2d 172, 191 (2nd Cir.1975) The general purpose of an award of inter-

10. The defendants have requested that several members of the plaintiff class be released. This request comes after the court issued a decision certifying the class, after a full trial on the merits, after an appeal and remand, and after a second trial to determine damages. While the court certainly understands the uncomfortable situation of these plaintiffs (who, for the most part, are relatives of the defendants), the court will not permit them to opt-out of the class. Releasing these plaintiffs at this late stage of the litigation would operate to the prejudice of the other minority shareholders. A smaller plaintiff class would result in a smaller award of damages and consequently a smaller number of persons who must bear the burden of paying the substantial costs and disbursements incurred in prosecuting this action. The now reluctant plaintiffs may simply turn over any unwanted award of damages to the defendant of their choice. Therefore, the court will not exercise its discretion to release any members of the plaintiff class.

est is "compensatory, not penal." *United States v. Seaboard Sur. Co.*, 817 F.2d 956, 966 (2nd Cir.), *cert. denied* 484 U.S. 855, 108 S.Ct. 161, 98 L.Ed.2d 115 (1987). Given the deliberate fraudulent conduct of the defendants as determined by the Appellate Court in *Wilson II*, 855 F.2d at 991, this court's finding that the plaintiffs have not engaged in delay, and the inequity which would result from a lack of an award of interest, this court has determined that an award of pre-judgment interest is appropriate. The plaintiff class asserts that interest should be charged at the treasury note rate for each year since 1979, while the defendants assert that the interest, if any, should be calculated at a rate of 6%—the same rate as the GAI Series B preferred dividend. The court finds that any appropriate award of interest is a rate of 9% compounded annually. A 9% rate cannot be considered punitive but does operate to fairly reimburse the plaintiff class for the loss of the use of its money.

### Conclusion

The court holds that the plaintiff class has incurred $776,000 in damages as a result of the defendants' fraudulent conduct in the 1979 merger of Chenango Industries, Inc., into Great American Industries, Inc. The clerk of the court is directed to calculate, and enter in the judgment against the defendants, an award of pre-judgment interest at a rate of 9% compounded annually from the date the merger was finalized, that is, October 31, 1979, until the date of the issuance of this decision.[11]

IT IS SO ORDERED.

**11.** The defendants have now made a motion, returnable on September 18, 1990, for a stay of all further proceedings on this matter pending the issuance by the Supreme Court of a decision in *Virginia Bankshares, Inc. v. Sandberg*, No. 89–1448. It is defendants' position that that case may establish rules of law which are dis-positive of this matter. Given that this court is working under a directive from the Second Circuit, and that the defendants have taken no appeal from the decision of the appellate court, the court finds no reason to delay the issuance of this decision.