Alexander **WILSON**, individually and as representative of all minority shareholders of Chenango Industries, Inc., other than defendants on and before October 18, 1979, Plaintiff,

v.

**GREAT AMERICAN INDUSTRIES, INC.** as a corporate entity and as a sole shareholder of Chenango Industries, Inc., Milton Koffman, Burton I. Koffman, Richard E. Koffman, as directors of Great American Industries, Inc.,

Chenango Industries, Inc., Joseph M. Stack as the representative of Chenango Industries in the merger between Chenango and Great American Industries, and Gary Crounse, David Keith Dyer and Sharon Lee Dyer, as Co-Executors of the Estate of David L. Dyer, deceased, William Starner, and Anthony Mincolla as directors of Chenango Industries, Inc., Defendants.

No. 80–CV–841.

United States District Court, N.D. New York.

April 25, 1991.

Coughlin & Gerhart (Peter H. Bouman, of counsel), Binghamton, N.Y., for plaintiff.

Beveridge & Diamond (John N. Hanson, John S. Guttmann, Daan H. Cannon, of counsel), Washington, D.C., for GAI defendants.

Hancock & Estabrook (Donald J. Kemple, of counsel), Syracuse, N.Y., for Chenango defendants.

## MEMORANDUM–DECISION & ORDER

McCURN, Chief Judge.

On September 5, 1990, this court issued a memorandum-decision and order in which it awarded $776,000.00 in damages to the plaintiffs, a class of former minority shareholders in defendant Chenango Industries, Inc. ("Chenango"), for the fraudulent conduct of Chenango and defendant Great American Industries, Inc. ("GAI") in issuing a proxy statement as part of Chenango's merger into GAI in 1979. *Wilson v. Great American Indus., Inc.*, 746 F.Supp. 251 (N.D.N.Y.1990) (*"Wilson III"*). The clerk of the court was directed to enter an award of pre-judgment interest at a rate of 9 percent compounded annually from the date the merger was finalized, October 31, 1979, to the date of the court's decision, September 5, 1990.

That decision was made on remand from the Second Circuit, which reversed this court's earlier judgment in favor of the

defendants. *Wilson v. Great American Indus., Inc.,* 855 F.2d 987 (2d Cir.1988) (*"Wilson II"*). The Second Circuit found that the proxy statement issued by the defendants contained material omissions and misrepresentations in violation of section 14(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78n(a); and Rule 14a–9, 17 C.F.R. § 240.14a–9. The Second Circuit held that the plaintiffs were entitled to recover damages "equivalent to the benefit of the bargain they would have obtained had full disclosure been made," and directed this court to provide plaintiffs with another chance to prove their damages. *Wilson II,* 855 F.2d at 996–97. This court subsequently conducted another trial on the damages issue, and set forth its September 5, 1990, decision on damages upon consideration of the evidence presented there and at the previous trial.[1]

The plaintiffs and defendants Chenango and GAI have filed motions for reconsideration of the September 5, 1990, decision. The court granted reconsideration and heard oral argument on the motions on December 27, 1990. The following constitutes the court's rulings on the motions.

## Discussion

### I. DEFENDANTS' MOTION

The defendants moved for reconsideration on several grounds, which will be addressed seriatim.

### A. Calculation of Interest

The defendants contend, and the plaintiffs agree, that the clerk of the court's calculation of pre-judgment interest was erroneous, in that the clerk apparently included an extra year of interest in the calculation. Nine percent interest compounded annually on $776,000 from October 31, 1979, to September 5, 1990, would amount to $1,201,043.00. The amount of interest calculated by the clerk's office was

$1,364,777.03, a difference of approximately $163,734.00. The court agrees with the parties that the interest was mistakenly calculated, and directs the clerk's office to amend the judgment accordingly.

### B. Fraud

The defendants argue that the court's calculation of damages under the standard enunciated in *Janigan v. Taylor,* 344 F.2d 781 (1st Cir.), *cert. denied,* 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965), was erroneous since there was no finding that the defendants acted fraudulently in issuing the proxy statement.[2] Although the defendants are correct that the Second Circuit found liability under section 14(a) of the Securities Exchange Act, which does not require a finding of scienter, the court of appeals went on to say that "[t]he district court's finding that nondisclosure was a deliberate decision demonstrates a culpable state of mind far in excess of negligence." *Wilson II,* 855 F.2d at 995. In addition, the court of appeals found that "[w]hen, *as here,* the *fraudulent* buyer received more than the seller's actual loss, damages are the amount of the defendant's profit." *Id.* at 996 (emphasis added) (citations omitted). Given these findings, there can be no doubt that the Second Circuit determined that, by their actions, the defendants defrauded the plaintiffs. This court is bound by that decision and therefore its computation of damages must be governed by the standard established in *Janigan v. Taylor,* 344 F.2d 781, 786 (1st Cir.), *cert. denied,* 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965), as mandated by the Second Circuit.

### C. Measure of Damages

The defendants argue that Mr. Higgins's use of an 18 percent growth rate for five years and this court's use of the "Gordon Model" were inappropriate under the circumstances. While it is true that Mr. Stack's projection of an 18 percent growth

---

1. The decisions by this court and by the Second Circuit in *Wilson I, II,* and *III* provide a thorough treatment of the background in this case, and the court will assume the reader's familiarity with those decisions.

2. The court in *Janigan* held that, where securities are sold to a fraudulent buyer, and the buyer received more than the seller's actual loss, "damages are the amount of the defendant's profit." *Janigan,* 344 F.2d at 786; *see also Wilson II,* 855 F.2d at 996.

for three years was the basis for Mr. Higgins's conclusions, it does not follow that Mr. Higgins's extension of such a growth rate was unsupported by the facts. In addition to Mr. Stack's estimates, Mr. Higgins used economic conditions and forecasts available at the time as they affected the country, the electronics industry and Chenango's largest customer, IBM, in reaching his conclusions. Further, as plaintiffs point out, defendants did not raise this issue at trial, nor do they now point to any contrary evidence. Plaintiff's Memorandum of Law, p. 8. Given these facts, this court finds that Mr. Higgins's use of an 18 percent growth rate of five years is appropriate under the circumstances.

Finally, defendants argue that this court "double counted" the earnings for the years 1979–84 in its use of the Gordon Model. This is not the case. Having accepted defendants' argument that Mr. Higgins's calculations resulted in an estimate of Chenango's future earnings power as of 1984, rather than 1979, *Wilson III*, 746 F.Supp. at 265, this court's calculation had to account for these five "missing" years. This calculation thus does not result in double counting, but rather makes up for Mr. Higgins's misapplication of the Gordon Model to this situation. Without the use of this additional calculation, the earnings for the years 1979–84 would have remained uncounted.

### D. Valuation of Lancaster Towers

The defendants argue that Lancaster Towers should be valued as a "tax shelter" rather than at its fair market value of $1.1 million as set forth by Mr. Stack in his application for the IDA loan. *Wilson II*, 855 F.2d at 994 (citing *Wilson v. Great American Indus., Inc.*, 661 F.Supp. 1555, at 1566 (N.D.N.Y.1987) ("*Wilson I*"). This court finds no justification for this change in valuation. Defendants had ample opportunity to present proof in support of this argument at trial but failed to do so. In addition, it seems inappropriate to accept defendants' arguments that their valuation of Lancaster Towers at the time of their IDA application was made in "good faith" while now permitting them to argue that this valuation can no longer be supported by the facts. Given the Second Circuit's conclusion that Lancaster Towers presumably had a net worth in the neighborhood of $1.1 million and the lack of evidence to the contrary, this court finds the $1.1 million figure to be appropriate.

### E. Lack of Liquidity of Chenango Stock

There is no doubt, as defendants point out, that there was no market for Chenango common stock. As this court pointed out in *Wilson III*, "[a]ny price of Chenango was essentially set by Mr. Stack, a participant ... in the fraudulent sale of Chenango, and does not appear to have any relation to the future earnings power of the company viewed prospectively from the date of the merger." *Wilson III*, 746 F.Supp. at 261. It was this finding, among others, which prompted this court to adopt Mr. Higgins's model to measure damages rather than the other alternatives which were grounded on a finding of market value for Chenango common stock. Therefore, it would have been inappropriate for this court to take into account the lack of the stock's liquidity in measuring damages using the Gordon Model.

### F. Interest

■ Pursuant to the provision in New York Civil Practice Law and Rules § 5004 that "[i]nterest [upon judgments] shall be at the rate of nine per centum per annum ...," this court finds that this is the appropriate rate of interest in this case. Such interest may be compounded if the court determines that the defendants acted in bad faith. *See Matter of Revson*, 86 A.D.2d 872, 447 N.Y.S.2d 297, 302 (2d Dep't 1982) (citing *Brown v. Knapp*, 79 N.Y. 136, 145). Since the Second Circuit found that the defendants acted fraudulently with respect to the plaintiffs, this court, in its discretion, holds that compound interest is appropriate under these circumstances.

## II. PLAINTIFFS' MOTION

■ The plaintiffs argue that the percentage of minority shareholders compris-

ing the plaintiff class was miscalculated, and that it should be corrected upward to increase the size of the class. The court previously defined the class as:

> persons who were stockholders of Chenango Industries on October 18, 1979 [the date of the merger], exclusive of defendants.

*Wilson v. Great American Indus., Inc.,* 94 F.R.D. 570, 577 (N.D.N.Y.1982). Those shareholders were provided notice of the action and were notified of their option to "opt out" of the class. *See id.* Requests to opt out were filed with the court and are reflected on the docket sheet.

During the course of the trial on damages, the parties used a figure of 18.77 percent, representing the percentage of shareholders who were not defendants and who did not opt out of the class, which the court used to calculate damages. This figure was apparently based on a representation by the defendants that they had reviewed the docket sheet and the list of shareholders, and determined that that figure was correct.[3]

Plaintiff's counsel now argues that the plaintiff class should be designated as those shareholders of Chenango stock on October 18, 1979, other than (a) the named defendants, and (b) those shareholders filing elections to opt out of the class in accordance with the class notice. That percentage, as calculated by the plaintiffs, is 19.95 percent.[4]

The defendants argue, unpersuasively, that those shareholders who held 110 shares or fewer of Chenango stock and were thus entitled to choose cash payments for their stock rather than GAI Series B preferred stock,[5] are not part of the class. Under the terms of the merger, Chenango's shareholders exchanged their Chenango shares for newly issued GAI Series B preferred stock. Those shareholders who owned 110 or fewer shares of Chenango stock, however, had the option of receiving $5.00 cash per share, or exchanging their stock for GAI Series B preferred. *See Wilson I,* 661 F.Supp. at 1561. These shareholders certainly were damaged, just as the other minority shareholders were, by the material omissions in the proxy statement since they may likewise have been induced to surrender their Chenango shares for less than their true value. The court sees no difference for purposes of this discussion between a shareholder accepting a cash payment below the value of stock he or she possessed, and one who takes undervalued stock. Although the $5.00 per share these shareholders received was greater than the $2.58 per share the court found to be the value of the GAI Series B stock received by other shareholders, both amounts are considerably less than the $16.32 the court found to be the true value of the Chenango stock held by the shareholders at the time of the merger.[6] This merely creates a difference in the amount of damages individual shareholders should receive, and does not mandate that

---

**3.** The court made the following calculation in determining damages:

| | |
|---|---|
| Fair Market Value of Chenango 10/18/79 | $4,909,000 |
| Minus: 10/31/79 immediate conversion value of GAI Series B preferred | — $777,000(rounded) |
| | = $4,132,000 |
| Multiplied by % of Minority Shareholders in Plaintiff Class | × 18.77% |
| Damages Due Plaintiff Class | = $776,000(rounded) |

**4.** This figure is arrived at by subtracting the shares of stock held by the named defendants and those shareholders filing opt out elections from the total shares of stock:

| | |
|---|---|
| Total Shares | 300,777 |
| Shares Held by Defendants and Opted Out | — 240,776 |
| | 60,001 = 19.95% |

**5.** There were 130 of these smaller shareholders, about half of the total of 259 individual shareholders. Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion to Amend Judgment, p. 10.

**6.** The value of a share of GAI Series B preferred stock is calculated by dividing the value of the stock received by Chenango stockholders, $776,969.00, by the total number of shares of Chenango stock, 300,777. *See* Kemple Affidavit, ¶ 21. The value of Chenango common stock is calculated by dividing the fair market value of Chenango as of the date of the merger as determined by the court, $4,909,000, by the total number of shares, 300,777.

they be excluded from the class of plaintiffs.

■ The plaintiff also urges the court to include in the class those shareholders who dissented from the merger. The court has previously stated that those dissenters, who held a total of 4,200 Chenango shares at the time of the merger, are not part of the plaintiff class. *Wilson III*, 746 F.Supp. at 254. The court notes, however, that that statement was *dictum*, and that it was apparently made based on court's assumption that these shareholders had accepted "cash settlements." The affidavits submitted by the dissenters on this motion indicate that they did not accept payments in settlement of any claims they might have against the defendants, and that they made no agreement not to pursue further claims against the defendants. *Id.* It would be unjust to exclude the dissenters from the class, since they were damaged by the fraudulent proxy statement in the same way the other class members were. In addition, the dissenting shareholders are included in the definition of the class, i.e., all Chenango shareholders on the date of the merger, excluding the defendants and those who opted out of the class.[7] The court therefore modifies its previous decision to the extent that it excluded the dissenting shareholders from the class. *See* Fed.R.Civ.P. 60(b)(6).

■ The defendants' argument that the class is defined by plaintiff's answer to part 74(a) of defendants' interrogatories is disingenuous. Not only has the court certified the plaintiff class as the Chenango shareholders as of the date of the merger, exclusive of defendants, it has also explicitly stated that the class includes those individuals listed in part 74(a) of the answers to interrogatories *and* each individual "who was a shareholder of Chenango Industries on October 18, 1979." *Wilson*, 94 F.R.D. at 576. In addition, the composition of the class may be modified by the court until judgment is entered. *See* Fed.R.Civ.P. 23(c)(3).

The defendants further urge that the plaintiff had the burden of proving at trial which of the holders of 100 shares or fewer received stock and which received cash, and absent such proof, all of the holders of 100 shares or fewer should be excluded from the class. The plaintiff argues, on the other hand, that the defendants bore the burden of demonstrating that damages should be offset by the difference in the amounts received by the shareholders who elected to take stock and those who took cash, and have failed to do so. Thus, the plaintiff contends, no distinction should be made in damages awarded to the members of the class. Neither party provides the court with any authority for or any logical argument supporting their positions, and the court is not persuaded to adopt either of the arguments.

The court finds upon reconsideration that the class is composed of Chenango shareholders as of October 18, 1979, excluding the defendants, and those shareholders who opted out of the class. The court adopts the plaintiff's recalculation of the percentage of shares held by the class, 19.95%. Damages to the holders of 110 shares or less who took cash payments rather than GAI Series B stock will be diminished by $2.42 per share, the difference between the $2.58 per share value of GAI Series B stock as determined by the court and the $5.00 cash payments. The damages to the dissenters should be likewise diminished in accordance with the amount of the cash payments they received. The parties are directed to arrive at a mutually acceptable agreement as to the specifics of same within 20 days of the filing of this decision. In the absence of such agreement the court upon notice of same will appoint a special master to make such determination and report to the court thereon. In the latter event the parties will equally bear the fees and expenses of the special master.

IT IS SO ORDERED.

---

7. The dissenting shareholders did not file notices with the court opting out of the class.