979 F.2d 924
 61 USLW 2342, Fed. Sec. L. Rep. P 97,236
 Alexander WILSON, individually and as representative of all
minority shareholders of Chenango Industries, Inc., other
than defendants on and before October 18, 1979,
Plaintiffs-Appellees, Cross-Appellants,
v.
GREAT AMERICAN INDUSTRIES, INC., as corporate entity and as
a sole shareholder of Chenango Industries, Inc.; Milton
Koffman; Burton I. Koffman; Richard E. Koffman; as
Directors of Great American Industries, Inc.; Chenango
Industries, Inc.; Joseph M. Stack, as the representative of
Chenango Industries in the merger between Chenango and Great
American Industries; Gary Crounse; David Keith Dyer;
Sharon Lee Dyer, as co-executors of the estate of David L.
Dyer, deceased; William Starner; Anthony Mincolla, as
directors of Chenango Industries, Inc.,
Defendants-Appellants, Cross-Appellees.
 Nos. 787, 997, Dockets 91-7682, 91-7708.
 United States Court of Appeals,
 Second Circuit.
Argued Jan. 16, 1992.
Decided Nov. 17, 1992.
 
 John S. Guttman, Washington, D.C. (Albert J. Beveridge, III, Beveridge & Diamond, P.C., Washington, D.C., Donald J. Kemple, Hancock & Estabrook, Syracuse, N.Y., of counsel), for defendants-appellants, cross-appellees.
 Peter H. Bouman, Binghamton, N.Y. (Richard W. Mertens, Coughlin & Gerhart, of counsel), for plaintiffs-appellees, cross-appellants.
 Before VAN GRAAFEILAND, CARDAMONE and McLAUGHLIN, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 Defendants appeal and plaintiffs cross appeal from two decisions and orders of the United States District Court for the Northern District of New York (McCurn, C.J.) that awarded damages to plaintiffs because of misrepresentations contained in a joint proxy/prospectus issued in connection with a merger of defendant Chenango Industries, Incorporated (Chenango) into defendant Great American Industries, Incorporated (Great American). Defendants assert that the intervening Supreme Court decision in Virginia Bankshares, Inc. v. Sandberg, --- U.S. ----, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991), compels dismissal of plaintiffs' causes of action on the grounds that as minority shareholders, without power to influence the proposed merger, they suffered no compensable damages under § 14(a) of the Security Exchange Act, notwithstanding that their votes were solicited by proxies containing material misrepresentations. Defendants and plaintiffs also claim the district court incorrectly calculated damages.
 
 BACKGROUND
 
 2
 The facts in this almost 12-year-old case have been set forth in substantial detail twice before, see Wilson v. Great American Industries, Inc., 661 F.Supp. 1555 (N.D.N.Y.1987) (Wilson I ), rev'd, 855 F.2d 987 (2d Cir.1988) (Wilson II ). Familiarity with those decisions is assumed, as well as with the decisions of the district court from which this appeal and cross-appeal are taken, reported at 746 F.Supp. 251 (N.D.N.Y.1990) (Wilson III ) and at 763 F.Supp. 688 (N.D.N.Y.1991) (Wilson IV ).
 
 
 3
 Plaintiffs, former minority shareholders of Chenango, are represented as a class by Alexander Wilson. Defendants are Great American, Chenango, and various officers, directors, and attorneys connected with those two corporations. Plaintiffs brought suit in the Northern District of New York on October 17, 1980 alleging defendants violated §§ 10(b), 14(a), and 18(a) of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78n(a), and 78r(a), (Act), as implemented by Rules 10b-5 and 14a-9, 17 C.F.R. §§ 240.10b-5 and 14a-9 (1992), and § 12(2) of the Securities Act of 1933, 15 U.S.C. § 771(2). They allege defendants are guilty of omissions or misrepresentations of material fact in the joint proxy/prospectus distributed to all shareholders between September 27 and October 18, 1979 pursuant to the proposed merger of Chenango into Great American. Great American manufactures rubber goods, corrugated boxes, and recreational products that are marketed through its subsidiaries. Chenango supplies services and equipment to electronic equipment manufacturers. It also owns Lancaster Towers, a home for the elderly, from which it derives substantial tax benefits.
 
 
 4
 The thrust of plaintiffs' complaint is that the material misstatements induced them to exchange their shares of Chenango common stock for new preferred stock in Great American. Defendants at the time of the merger owned 73 percent of Chenango's stock, well over the two thirds necessary under New York law to approve a corporate merger. New York law only required that defendants hold a shareholders' meeting prior to which Chenango was required to give each shareholder notice of the meeting accompanied by a "copy of the plan of merger." N.Y.Bus.Corp. Law § 903(a)(1) (McKinney 1986). Because Chenango stock was registered under § 12(g) of the Act, 15 U.S.C. § 78l (g), defendants were also required to provide shareholders with an "Information Statement" pursuant to § 14(c) of the Act, 15 U.S.C. § 78n(c). Nonetheless, defendants mailed out joint proxy and registration statements seeking Chenango minority shareholders' approval of the merger.
 
 
 5
 The misrepresentations or omissions contained in the proxy created an unfair exchange ratio, plaintiffs assert, by overvaluing Great American's stock and undervaluing Chenango's stock. The principal terms of the mergers were as follows: the aggregate book value of Chenango's common stock purportedly was $1.2 million or about $4 per share. For their shares of Chenango common stock, plaintiffs received new Series B preferred stock in Great American with an asserted aggregate par value of $1.2 million, bearing a 6 percent dividend and convertible into Great American common stock at the rate of 6 shares of Series B to 5 shares of common. Because Great American preferred stock was valued at $10 per share, the Chenango stock was exchanged at a rate of two and a half shares for one share of Great American's preferred stock. Shareholders of Chenango approved the merger on October 18, 1979. On October 31, 1979 Chenango became a wholly-owned subsidiary of Great American.
 
 
 6
 In Wilson I the district court granted judgment in favor of defendants because it found plaintiffs had failed to establish a violation of federal securities law. It ruled that out of 13 alleged misrepresentations or omissions, plaintiffs had proved only one was material, and this single omission was not shown to have been accompanied by the requisite scienter. In dismissing each of the four securities law theories alleged, the district court noted defendants failed to contest the issue of causation and therefore concluded that element had been met. See Wilson I, 661 F.Supp. at 1562. Plaintiffs' causes of action under §§ 10(b), 14(a), 18(a) and 12(2) were dismissed.
 
 
 7
 In reversing Wilson II, a panel of this Court found the proxy statement contained five material omissions or misrepresentations and therefore violated § 14(a) of the Securities and Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9. See 855 F.2d at 991-95. Without discussing the element of causation, we ruled that all defendants--based on their knowledge of the true facts and the omission or misrepresentation of these facts in the proxy--were culpable under § 14(a) of the Act and hence liable to plaintiffs. Id. at 995. Plaintiffs' other causes of action brought under 15 U.S.C. §§ 77l, 78j(b), and 78r(a) that had been dismissed by the trial court were not discussed. Holding that plaintiffs should receive a second opportunity to prove their damages, we remanded with specific instructions as to how to measure those damages. Because the defendants had acted fraudulently, we stated "plaintiffs are entitled to recover damages equivalent to the benefit of the bargain they would have obtained had full disclosure been made. The determination of damages should include a valuation of Chenango's future earning power, viewed prospectively from the date of the merger." Id. at 996. These damages, we continued, should be the amount of the defendants' improperly obtained profit, "even of windfalls," and could include unrealized appreciations in the value of the stock. Id.
 
 
 8
 Upon remand, the district court selected a method for measuring damages that compared the value of what the plaintiffs should have received for their shares of Chenango stock and the actual value of what they received in exchange--Great American's preferred stock. See Wilson III, 746 F.Supp. at 256-57. Five experts testified at trial concerning the calculation of damages and proposed different methods for appraising the value of Great American and Chenango stock. Although the trial judge noted that each witness "engaged in a rather exceptional amount of numbers juggling to reach a desired result," id. at 258, one expert, Thomas Higgins, presented the most credible and thorough testimony. For the value of the Chenango stock, the trial court selected the appraisal method proposed by Higgins, known as the capitalization of earnings power method, which it regarded as least susceptible to result oriented manipulation and at the same time most closely followed the mandate in Wilson II to include in any calculation of damages "a valuation of Chenango's future earning power viewed prospectively from the date of the merger." Id. at 254. This method uses the "Gordon Model," which defines the value of a corporation as the combined value of all future earnings. 746 F.Supp. at 264.
 
 
 9
 Several of the expert's initial assumptions were adopted, including his calculation of the expected rate of return, the projected annual rates of growth for the five year period from 1979-1984 and thereafter, and the projected net income of the corporation in 1979. At the same time, the district court believed Higgins in several respects incorrectly applied this appraisal method. Based on cross examination it was first determined that "application of [the] formula [by Higgins] actually [was] an estimate of Chenango's future earning power as of 1984," and required discounting to 1979 dollars. Id. at 265. The trial court decided further that the Gordon Model only accounted for the 1979 value of Chenango's post 1984 earnings. An accurate appraisal of Chenango's net worth required an accounting also of the value of earnings of Chenango for the five year period between 1979 and 1984. See id. at 265-66. Adding the 1979 value of Chenango's projected earnings for both the period between 1979 and 1984 and the post-1984 period to the fair market value of Lancaster Towers, the district court calculated Chenango's common stock had a fair market value of $4,909,000 at the time of the merger.
 
 
 10
 Turning to the Great American Series B preferred stock that Chenango shareholders received in exchange, the trial court determined its actual value on the date of the merger was the exchange value for Great American common stock publicly traded on the American Stock Exchange. The 120,310 shares of Great American preferred stock exchanged in the merger could have been exchanged at a 6/5 ratio for 100,254 shares of Great American common stock. The price of Great American common on October 31, 1979 was $7.75, making the total value of the preferred stock exchanged for Chenango shares $776,969. The district court concluded therefore that defendants essentially had offered to pay $2.59 per share for plaintiffs' Chenango common stock worth $16.36 per share. See id. at 267.
 
 
 11
 Consequently, all the shareholders of Chenango were defrauded in the amount of $4,132,000. The plaintiff class comprising 18.77 percent of those shareholders received $776,000 less than they would have if the true values of the corporations were reflected in the merger exchange. To this amount of damages pre-judgment interest of 9 percent compounded annually was added. With so many variables introduced over time, such as management decisions, changes in the market, and other complex factors, the district court was unable to decide, without undue speculation, that any accretion in value was a proximate consequence of the fraud. Instead, it awarded interest it believed would fairly and adequately compensate plaintiffs and disgorge from defendants their fraudulent profit, following directions we had given it in Wilson II.
 
 
 12
 Upon a motion for reconsideration, the district court modified its order by increasing the percentage of minority shareholders entitled to share in the award and in certain other respects not relevant on this appeal. See Wilson IV, 763 F.Supp. 688. It did not believe it had double counted Chenango's earnings from 1979 to 1984. By discounting earnings as of 1984 into 1979 dollars, it stated it "had to account for these five 'missing' years." Id. at 691. It found its correction to account for those years "[made] up for Mr. Higgins's misapplication of the Gordon Model to this situation." Id.
 
 
 13
 From Wilson III and Wilson IV defendants brought the instant appeal, and plaintiffs their cross-appeal. After they were filed, the Supreme Court handed down its decision in Virginia Bankshares, Inc. v. Sandberg, --- U.S. ----, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991). Defendants thereupon requested the district court to reconsider its decisions in Wilson III and Wilson IV in light of what defendants considered an intervening change in the law articulated in Virginia Bankshares. Granting the request for reconsideration, the trial court declined to depart from its ruling in Wilson III. A departure was not warranted, it determined, because Virginia Bankshares did not expressly determine whether minority shareholders unable to influence a merger nevertheless could establish a causal link between a defective proxy and the vote in favor of the merger sufficient to support an implied private cause of action under § 14(a) for lost state appraisal remedies.
 
 
 14
 Further, defendants assert our earlier decision in Wilson II--that established defendants' liability and remanded the case for a determination of damages--must be reversed in light of Virginia Bankshares. Under rules set forth in that case, defendants continue, minority shareholders situated as are plaintiffs can prove no damages from proxy misrepresentations under § 14(a). In addition, § 14(a) does not provide a private cause of action for lost state remedies--such as appraisal rights--and, even if a federal private cause of action is available, it does not provide greater relief than that provided under state law. As to that, defendants declare, plaintiffs cannot prove the defective proxy caused them to lose any state remedies. In the discussion that follows that leads us to affirm the district court in part, reverse it in part, and remand this case once again, we readily acknowledge our share of responsibility for its necessity.
 
 DISCUSSION
 
 15
 * A. Intervening Supreme Court Decision
 
 
 16
 The Supreme Court in Virginia Bankshares did not hold that minority shareholders whose votes number too few to affect the outcome of a shareholder vote may never recover damages under § 14(a) or that no implied private cause of action for such shareholders is provided under that section of the Act. And, it expressly declined to decide whether § 14(a) provides an implied federal remedy for minority shareholders deprived of certain state remedies as a result of deceptive proxy solicitations. --- U.S. at ---- & n. 14, 111 S.Ct. at 2766 & n. 14. To the extent that this Circuit recognizes such a remedy, defendants incorrectly contend therefore that Virginia Bankshares precludes plaintiffs from seeking such relief.
 
 
 17
 Plaintiffs in Virginia Bankshares were 15 percent minority shareholders offered $42 per share in a freeze-out merger for shares that a jury later determined were worth $60 each. Although not required to either by law or corporate by-laws, defendants solicited proxy votes to approve the merger. The Supreme Court held that although the proxy may have included material misrepresentations within the meaning of § 14(a), plaintiffs could prove no causation entitling them to damages under that section of the Act. Earlier, in Mills v. Electric Auto-Lite Co., 396 U.S. 375, 385, 90 S.Ct. 616, 622, 24 L.Ed.2d 593 (1970), the Court found minority shareholders who could affect the outcome of a merger vote could establish the necessary causation element of their suit--when the misrepresentations were material--because the proxy was an "essential link" in the accomplishment of the transaction. In Virginia Bankshares, on the other hand, the minority shareholder's votes were not necessary to authorize the corporate action, which forced the plaintiffs to rely on less direct theories of causation for their loss.
 
 
 18
 Virginia Bankshares ruled that Congress' silence regarding the creation of implied private rights of action under § 14(a), though fatal in the usual case, did not preclude the recognition of new rights of recovery. Because the Court has recognized certain implied rights under Mills and its progeny, it stated courts should rely on policy reasons to determine whether equity demands new implied causes of action be recognized for comparable would-be plaintiffs. Thus, in entertaining plaintiffs' arguments for alternative theories of causation, the Court declared that implied rights outside the contours of that recognized in Mills might exist under § 14(a).
 
 
 19
 One theory of causation advanced by the plaintiffs in Virginia Bankshares was that, but for the defective proxies, the minority shareholders would not have voted in favor of the merger. In that event, dissenting votes would have preserved their right to pursue under Virginia law avoidance of the merger based on an alleged conflict of interest on the part of one the Bank's directors. Recognizing the possibility that a sufficient causal relationship might be established between a materially deceptive proxy and lost state remedies to support an implied right of recovery, the Court reasoned that causation under this theory could not be established because plaintiffs had not proved any loss.
 
 
 20
 Virginia law barred suits seeking to avoid a merger tainted by a director's conflict of interest only if the ratifying vote was procured pursuant to full disclosure of the material facts of the transaction, including the conflict of interest. Plaintiffs' contention that the proxy contained material misrepresentations necessarily prevented their loss of relief under this state law. Plaintiffs failed to allege any other lost state remedy. Hence, since plaintiffs failed to establish the necessary injury required under a theory of causation alleging lost state remedies, they could not succeed under such theory. The Supreme Court therefore found it unnecessary to decide whether § 14(a) provided such implied relief.
 
 B. Plaintiff's Theories of Recovery
 
 21
 Plaintiffs in the present action seek recovery under four separate federal securities law provisions. In reversing the trial court's dismissal, we imposed liability only under § 14(a), without commenting on plaintiffs' other three causes of action. The necessary implication of our imposing liability under § 14(a) is the recognition of an implied private cause of action for minority shareholders who cannot affect the outcome of a corporate vote. In doing so, we did not comment on what theory of causation defendants' liability rested. Perhaps we presumed that plaintiffs had suffered an injury causally related to the defective proxy because defendants in Wilson I had not contested--and the district court found--causation.
 
 
 22
 Plaintiffs set forth two theories of causation to support their claims. They assert first that an implied action under any of the four securities law provisions pleaded should be recognized because 85 percent of the voting shares, or 12 percent of the minority shareholders in addition to the controlling majority shareholders, had to approve the merger in order for the exchange of stock to take place without tax consequences. Although an opinion letter stated the merger might have tax-free consequences for the majority shareholders if 85 percent of the shareholders approved it, such an approval level was not a requirement of the merger. If it was not an express condition of the merger, the higher rate of dissenting voters could only prevent the merger were it to influence the controlling majority. Such a speculative and hypothetical causal connection would make liability "turn on 'hazy' issues [and invite] self-serving testimony, strike suits, and protracted discovery, with little chance of reasoned resolution by pretrial process." Virginia Bankshares, --- U.S. at ----, 111 S.Ct. at 2765 (rejecting causal theory promised on majority's desire for "cosmetic" vote and avoidance of minority shareholders' ill-will). Thus, we reject this theory of causation.
 
 
 23
 Plaintiffs' second theory of causation--one with more merit and upon which § 14(a) causes of action have been sustained in the past--is that their deceptively procured vote in favor of the merger deprived them of their state appraisal rights under N.Y.Bus.Corp. Law §§ 623(a), (b) (McKinney 1986); § 910(a)(1) (McKinney Supp.1992). We and other courts have recognized that plaintiffs might prevail on such a § 14(a) theory. See Cole v. Schenley Indus., Inc., 563 F.2d 35, 39-40 (2d Cir.1977) (on a motion to dismiss complaint, implied right recognized when insignificant minority shareholders had state law alternatives to accepting merger); Schlick v. Penn-Dixie Cement Corp., 507 F.2d 374, 381-84 (2d Cir.1974) (though insignificant minority shareholders had no appraisal rights under state law, deprivation of measures other than casting proxies may support implied right to recovery under § 14(a)). See also Swanson v. American Consumers Indus., Inc., 475 F.2d 516, 520-21 (7th Cir.1973) (insignificant minority shareholders entitled to recovery for lost state appraisal rights under § 10(b)). Cf. Scattergood v. Perelman, 945 F.2d 618, 626 n. 4 (3rd Cir.1991) (noting possibility that implied right of recovery might exist for lost state remedies).
 
 
 24
 As noted, Virginia Bankshares left open the possibility that § 14(a) might include this type of implied right to recover and did not address whether the causal relationship between a deceptive proxy and lost state remedies was sufficient to support a federal remedy. Defendants, having failed to contest causation prior to the present appeal, see Wilson I, 661 F.Supp. at 1562, should hardly be allowed to argue the point now, especially when to permit such puts them in a better position than if they had made this objection earlier and lost. See Fogel v. Chestnutt, 668 F.2d 100, 108-09 (2d Cir.1981), cert. denied, 459 U.S. 828, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982).
 
 
 25
 We continue to believe that a minority shareholder, who has lost his right to a state appraisal because of a materially deceptive proxy, may make "a sufficient showing of causal relationship between the violation and the injury for which he seeks redress." Mills, 396 U.S. at 385, 90 S.Ct. at 622. The transaction effected by a proxy involves not only the merger of the corporate entities, and the attendant exchange of stock, but also the forfeiture of shareholders' appraisal rights. The injury sustained by a minority shareholder powerless to affect the outcome of the merger vote is not the merger but the loss of his appraisal right. The deceptive proxy plainly constitutes an "essential link" in accomplishing the forfeiture of this state right.
 
 
 26
 That the causal nexus between the merger and the proxy is absent when the minority stockholder's vote cannot affect the merger decision does not necessarily mean a causal link between the proxy and some other injury may not exist. We recognize that loss causation or economic harm to plaintiffs must be shown, as well as proof that the misrepresentations induced plaintiffs to engage in the subject transaction, that is, transaction causation. Here loss causation may be established when a proxy statement prompts a shareholder to accept an unfair exchange ratio for his shares rather than recoup a greater value through a state appraisal. And transaction causation may be shown when a proxy statement, because of material misrepresentations, causes a shareholder to forfeit his appraisal rights by voting in favor of the proposed corporate merger. See Schlick, 507 F.2d at 380; Note, Causation and Liability in Private Actions for Proxy Violations, 80 Yale L.J. 107, 123-27 (1970).
 
 
 27
 Even though the proxy was not legally required in this case, when defendants choose to issue a proxy plaintiffs have a right to a truthful one. With the Securities Exchange Act of 1934, Congress sought to promote fair corporate suffrage with respect to " 'every equity security' " by requiring an " 'explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought.' " Mills, 396 U.S. at 381, 90 S.Ct. at 620 (quoting H.R.Rep. No. 1383, 73d Cong., 2d Sess. 13-14 (1934)); see also J.I. Case Co. v. Borak, 377 U.S. 426, 431-32, 84 S.Ct. 1555, 1559-60, 12 L.Ed.2d 423 (1964). Congress' interest in the protection of investors and the " 'free exercise of [their] voting rights,' " Borak, 377 U.S. at 431, 84 S.Ct. at 1559 (quoting H.R.Rep. No. 1383, 73d Cong., 2d Sess. 14 (1934)), should not vary in degree according to the ability of the shareholder to affect the merger, if the vote nevertheless may result in a different sort of injury which full disclosure might have avoided. See Healey v. Catalyst Recovery of Pa., Inc., 616 F.2d 641, 646 (3d Cir.1980) (that harm to plaintiff from violation of 10b-5 was deprivation of a state remedy in no way lessens federal interest in preventing the violation); Schlick, 507 F.2d at 383.
 
 
 28
 The statute does not suggest that the prohibition of material misrepresentation in a proxy extends only to necessary proxies that are mailed to shareholders the solicitation of whose votes may affect the outcome of the proposed corporate action. That a controlling group of shareholders may accomplish any corporate change they want does not insulate them from liability for injury occasioned when they commit the sort of fraud that § 14(a) seeks to prevent. See Swanson v. American Consumer Indus., Inc., 415 F.2d 1326, 1331-32 (7th Cir.1969). To decline to extend the protection of § 14(a) to plaintiffs, we think, might sanction overreaching by controlling shareholders when the minority shareholders most need § 14(a)'s protection. See Schlick, 507 F.2d at 383. At the same time, allowing the action does not pose a threat of "speculative claims and procedural intractability," Virginia Bankshares, --- U.S. at ----, 111 S.Ct. at 2765, because the forfeiture of state appraisal rights is a question separate from the effectuation of the merger and does not require courts to guess how or whether the majority shareholders would have proceeded in the face of minority dissent.
 
 
 29
 Although a finding of materiality in a proxy solicitation may satisfy the elements of loss and transaction causation for forfeited state appraisal rights, plaintiffs must also prove that they in fact lost state appraisal rights. See Virginia Bankshares, at ---- & n. 14, 111 S.Ct. at 2766 & n. 14. In Wilson II, we presumed, not only that there existed a sufficient causal relationship between the proxy and a loss, but also that plaintiffs had actually sustained a loss. After deciding Wilson III and IV in September of 1990 and April of 1991 respectively, the district court upon a motion for reconsideration in light of Virginia Bankshares aptly stated in a Memorandum-Decision and Order dated August 14, 1991, 770 F.Supp. 85 (N.D.N.Y.): "[t]his court has never decided, and it is not clear, whether plaintiffs may have been deprived of some available state-law remedies by the misleading proxy statement." Accordingly, we must remand this matter for the limited purpose of determining whether the proxy solicitation actually resulted in the loss of any remedies available to plaintiffs under New York law.
 
 
 30
 We add--somewhat reluctantly at this late date--that the reversal in Wilson II resulted in the resurrection of all plaintiffs' claims regardless of the theory of liability advanced. Thus, plaintiffs' claims under §§ 10(b) and 18(a) of the Securities Exchange Act of 1934 and § 12(2) of the Securities Act of 1933 remain viable to the extent we found defendants at least negligently misrepresented or omitted material information in the proxy solicitation.
 
 II
 
 31
 Given the possibility that on remand defendants may again have liability imposed against them under § 14(a), we think it prudent to reach those aspects of the appeal and cross-appeal that challenge the trial court's calculation of damages. Defendants initially contend our mandate in Wilson II, that damages should be equal to the benefit of the bargain, is inappropriate when only state appraisal rights have been lost. In light of plaintiffs' inability to prevent the merger, defendants point out their acquisition of Chenango was not effected through fraud. Rather, they assert, only the forfeiture of the appraisal rights was caused by the deceptive proxy solicitation. We think our instructions in Wilson II still valid.
 
 
 32
 The benefit of the bargain rule set forth in Janigan v. Taylor, 344 F.2d 781 (1st Cir.), cert. denied, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965), is the appropriate measure of damages in this matter. Janigan held a shareholder induced by fraud into selling his shares for less than fair consideration may recover future accretions in value of the stock, even if those damages are not foreseeable. Id. at 786-87; see also Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741 (1972) (where defendant receives more than seller's actual loss, damages are the amount of defendant's profit). This rule applies to mergers involving fraudulent proxies as well as to face-to-face transactions under § 10(b). See Osofsky v. Zipf, 645 F.2d 107, 114 (2d Cir.1981). The goal of preventing the speculative fraud resulting when damages are awarded only for the difference in the values of the exchanged stocks, see id. (citing Restatement (Second) of Torts § 549(2), cmts. g, i (1977)), applies with as much force when appraisal rights are fraudulently forfeited as it does when a merger is fraudulently effected.
 
 
 33
 But to place plaintiffs in substantially the same position they would have occupied absent the fraud, they should be entitled to the profits attributable to the extra stock they would have received had the proxy provided a fair exchange ratio. Although the fraud may not be the proximate cause of the merger, it did cause the forfeiture of appraisal rights, which in turn prevented plaintiffs from realizing a fair exchange ratio. Thus the injury caused by the fraud cannot be measured by the shares that were exchanged, rather by the value of the additional shares that should have been exchanged but because of the fraud were not. The benefit of the bargain rule in the context of lost state appraisal rights would apply only to the stock never received, and not to the shares actually received. Cf. Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281, 1307 (2d Cir.1973). This statement of how the benefit of the bargain rule is applied when state appraisal rights are fraudulently lost is not inconsistent with our instructions in Wilson II.
 
 
 34
 Defendants next declare the trial court's calculation of damages is not supported by sufficient evidence in the record. They insist that though properly discounting the 1984 value of Chenango to 1979 dollars, the trial court erred in deciding that an accurate appraisal must also account for the value of Chenango's projected earnings during the five-year period from 1979 to 1984. Careful review of the record convinces us the trial court's computation of damages is fully supported by the testimony of the experts, and should be affirmed if liability is imposed, except with regard to the "correction" made to the Gordon model by adding Chenango's projected earnings for the period between 1979-1984. We agree the measure of damages should be the difference between what the minority shareholders actually received and what they would have received had Chenango and Great American been properly valued. The trial court properly selected the Gordon method for appraising the value of Chenango and we find no fault with its determination that plaintiffs' last expert at trial, Mr. Higgins, provided the most credible method for calculating damages.
 
 
 35
 Nor was it error to employ different appraisal methods for ascertaining the worth of the two differently situated corporations. Although the capitalization of earnings method for appraising Chenango required consideration of the corporation's potential growth--a factor not expressly considered in valuing Great American--the market valuation method of the latter, using its price per share on the American Stock Exchange on the date immediately prior to the merger, adequately approximates a market value suitable for comparison purposes. Appraisal and valuation methods for differently situated corporations require resort to technical economic concepts that quite often fall outside the realm of judicial expertise and require reliance on expert testimony. We know of no reason why different but perfectly credible valuation methods may not be used to appraise different corporations. Defendants fail to explain why the market value of Great American on the day before the merger would not have taken into account the corporation's future growth potential or future dividend prospects, factors we would anticipate to be of primary interest to the typical investor. Cf. Mills v. Electric Auto-Lite Co., 552 F.2d 1239, 1247-48 (7th Cir.), cert. denied, 434 U.S. 922, 98 S.Ct. 398, 54 L.Ed.2d 279 (1977).
 
 
 36
 Nevertheless, defendants correctly contend the "correction" in the Gordon Model was not supported by the record. The district court determined the Gordon Model as implemented by Higgins computed the future earning power of Chenango for the period after 1984 in 1984 dollars. It discounted the value of the corporation to 1979 dollars and then added the projected earnings of Chenango for the five year period between 1979-1984. With respect to the correction, it stated that, "[w]ithout the use of this additional calculation, the earnings for the years 1979-84 would have remained uncounted." Wilson IV, 763 F.Supp. at 691. But, in calculating what the district court considered only to be "Chenango's base earning power as of 1984," Wilson III, 746 F.Supp. at 265, Higgins used a variable that actually accounted for the projected earnings of Chenango during the earlier five-year period--the "Growth rate in earnings years 1-5" (18%). See id.
 
 
 37
 The district court properly discounted the Gordon computation from 1984 to 1979 dollars pursuant to the cross examination testimony of Higgins elicited by defendants. Yet, when it added to this discounted figure the 1979 value of Chenango's projected earnings from 1979 to 1984, it acted without any apparent support in the record. Calculations of damages not finding adequate support in the record may not be affirmed on appeal. See, e.g., In re Wolverton Assocs., 909 F.2d 1286, 1296 (9th Cir.1990); Alvary v. United States, 302 F.2d 790, 794-96 (2d Cir.1962).
 
 
 38
 Hence, if on remand liability is imposed, a hearing must be held on the limited issue of how to use the Gordon method properly. We do not intend the trial court should reopen for contest the valuation of Great American or the selection of a proper method for appraising Chenango, or even the selection of variables for use in the Gordon model. We leave to the district court's discretion the extent of the hearing it allows, directing only that all steps in the calculation of damages should find support in the record. Given the trial court's experience with the incredible and manipulative testimony proffered by both parties' experts, it might consider appointing its own expert as an aid in making its determination. See, e.g., Klurfeld v. Equity Enters., Inc., 79 A.D.2d 124, 138-39, 436 N.Y.S.2d 303 (1981).
 
 
 39
 Both parties contest the award of 9 percent compounded prejudgment interest. Defendants say it is excessive, inappropriate and punitive in effect. Plaintiffs, on the other hand, assert it insufficiently disgorges from defendants profits they realized as a proximate consequence of their fraud and is too low when compared to the profits actually realized and the market rates of return experienced during the 1980's. We affirm the district court's interest award. It acted within its discretion when it ruled any award of accretions in value of Great American stock would be unduely speculative. The award does not strike us as punitive under the circumstances; rather it accords with fundamental considerations of fairness and reasonably reflects what plaintiffs should have received absent the fraud.
 
 
 40
 We have carefully considered the remaining arguments of the parties on this appeal and cross-appeal and find them without sufficient merit to warrant discussion.
 
 CONCLUSION
 
 41
 Accordingly, the orders of the district court are affirmed, in part, reversed, in part, and the case is remanded for further proceedings consistent with this opinion.
 
 
 42
 VAN GRAAFEILAND, Circuit Judge, concurring in part and dissenting in part:
 
 
 43
 I concur with my colleagues that the matter must be remanded to the district court for a recomputation of damages. However, I believe that the recomputation they suggest does not go far enough. The district court's measurement of damages was based upon the market price of GAI's common stock as of the date of the merger, i.e., the market price prior to the merger. 746 F.Supp. at 267. In Viacom Int'l, Inc. v. Icahn, 946 F.2d 998, 1001 (2d Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1244, 117 L.Ed.2d 477 (1992), we said:
 
 
 44
 Determination of a stock's fair value is dependent on several factors. Market price is one of those factors but it is not the determining one.
 
 
 45
 The court below should have said the same thing. See Norte & Co. v. Huffines, 288 F.Supp. 855, 858 n. 2 (S.D.N.Y.1968), aff'd in part and remanded in part, 416 F.2d 1189 (2d Cir.1969), cert. denied, 397 U.S. 989, 90 S.Ct. 1121, 25 L.Ed.2d 396 (1970).
 
 
 46
 Moreover, for those Chenango shareholders who participated in the exchange of stock, the pre-merger price of the GAI stock lost most of its significance. Any shareholder who dissents from a proposed merger and seeks only the cash value of his stock is entitled to have the value determined as of the time of his pre-merger dissent. However, what the participating Chenango shareholders got in exchange for their shares was GAI stock with a post-merger value, i.e., the value of the GAI stock with the Chenango stock merged into it. Their damages should be based upon what they received, when they received it.
 
 
 47
 Any other method of computation gives participating plaintiffs a double recovery: (1) damages based upon an alleged undervaluation of Chenango stock vis-a-vis pre-merger valued GAI stock, and (2) the actual increase in value of the GAI stock resulting from the merger. The pre-merger market price on October 31, 1979, the date the merger was finalized, was $7.75 per share. 746 F.Supp. at 267. In 1985, the GAI stock was valued at $35 a share. Id. at 257. In the face of this almost 500 percent increase in market value, it is difficult to justify a damage award of over $2 million.